**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Keith Scandore, individually on behalf of himself and all others similarly situated, | x<br>:<br>:<br>:   Case No.<br>: |
| Plaintiffs, | : |
| v. | :<br>: |
| Nylabone Corp., | :   **CLASS ACTION**<br>:      **COMPLAINT**<br>: |
| Defendant. | :   <u>**JURY TRIAL DEMANDED**</u><br>:<br>: |
| | :<br>x |

Plaintiff, Keith Scandore (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1.    This action seeks to remedy the deceptive and misleading business practices of Nylabone Corp. (hereinafter "Defendant") with respect to the marketing and sales of Nylabone dental solutions, edible treats, and interactive treats for dogs (the "Products") throughout the State of New York and the country.

2.    Defendant manufactures, sells and distributes dental solutions (dental spray, chews, and toothpaste), edible treats, and interactive treats (chew toys with edible treats inside) for dogs.  The Products are sold at pet stores nationwide as well as on Defendant's website (www.nylabone.com) and third-party websites.

1

3.      Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e., that its Products are "Natural."  However, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain non-natural and synthetic ingredients.

4.      Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "natural" when purchasing the Products.  Plaintiff and Class Members paid a premium for the Products based upon the "natural" labeling.  Had Plaintiff and the Class Members known that the Products were not natural, they would not have purchased the Products at all or would have paid less for them.  Given that Plaintiff and Class Members purchased and paid a premium for the Products based on Defendant's misrepresentations and omissions, Plaintiff and Class Members suffered an injury in the amount of the purchase price of the Products and/or the premium paid based upon the misrepresentations.

5.      Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350 and the Magnuson-Moss Warranty Act.  Defendant breached and continues to breach its express implied warranties regarding the Products. Defendant has been and continues to be unjustly enriched.  Accordingly, Plaintiff brings this action against Defendant on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

6.      Nearly 90 million dogs lived in households in the United States in 2017, and that

2

number is steadily increasing.[1]

7.      As the pet treat and toy industry has grown, consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in pet food and products. Companies such as Defendant have capitalized on consumers' desires for purportedly "natural" pet products. Indeed, consumers are willing to pay, and have paid, a premium for pet products branded "natural" over products that contain synthetic ingredients. This trend has been particularly pronounced in the pet product industry. In 2017, for example, sales of "natural" pet foods topped $8.2 billion.[2] Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

8.      Despite the Products containing a number of non-natural or synthetic ingredients, Defendant markets the Products as being "Natural." Examples of the Products' labeling is depicted below[3]:

---

[1] https://www.statista.com/statistics/198100/dogs-in-the-united-states-since-2000/
[2] https://www.petfoodindustry.com/articles/6299-us-natural-pet-food-market-sales-top-us82-billion?v=preview
[3] A chart depicting which edible treat, dental solution, and interactive treat Products contain which synthetic ingredients is attached hereto as Exhibit A.

3

**Nylabone Natural Healthy Edibles Variety Pack**



**Synthetic Ingredients:**

Glycerin
Calcium Carbonate
Thiamine Mononitrate
Riboflavin
Niacin
Folic Acid
Dicalcium Phosphate
Potassium Chloride
Zinc Oxide

4

**Nylabone Advanced Oral Care Natural Toothpaste**



**Synthetic Ingredients:**

Sorbitol
Hydrated Silica
Glycerin
Ascorbic Acid
Sodium Lauryl Sulfate
Titanium Dioxide
Sodium Benzoate
Potassium Sorbate

5

**Nylabone Healthy Edibles Dental Chew Treats**



**Synthetic Ingredients:**
Glycerin
Gelatin
Calcium Carbonate
Thiamine Mononitrate
Riboflavin
Niacin
Folic Acid
Dicalcium Phosphate
Potassium Chloride
Calcium Chloride
Zinc Oxide
Calcium Chloride

6

**Nylabone Natural Nubz Edible Chews (Chicken Flavor)**



**Synthetic Ingredients:**

Glycerin
Calcium Carbonate
Citric Acid

9.      Defendant's representations that the Products are "Natural" is false, misleading, and deceptive because the Products contain multiple ingredients that are, as explained below, synthetic.

      **a.  Riboflavin** (C17H20N4O6, CAS Reg. No. 83885) occurs as yellow to orange yellow needles that are crystallized from 2N acetic acid, alcohol, water, or pyridine. It may be prepared by chemical synthesis, biosynthetically by the organism Eremothecium ashbyii, or isolated from natural sources.  21 C.F.R.

§ 184.1695.  Further, as set forth in 21 CFR § 73.450, riboflavin is a color

additive.  Riboflavin is synthetic.

b. **Niacin** ($C6H5NO2$, CAS Reg. No. 59-67-6) is the chemical 3-pyridinecarboxylic

acid (nicotinic acid). It is a non-hygroscopic, stable, white, crystalline solid that

sublimes without decomposition at about 230 deg. C. It is soluble in water and

alcohol. It is insoluble in ether. 21 C.F.R. § 184.1530.  Niacin is synthetic.

c. **Folic Acid** is the chemical N -[4-<(2-amino-1,4-dihydro-4-oxo-6-

pteridinyl)methyl]amino]benzoyl]-L -glutamic acid.  21 C.F.R. § 172.345. Folic

acid is synthetic.

d. **Potassium Chloride** is a synthetic white, odorless solid prepared from source

minerals by fractional crystallization or flotation. It is soluble in water and

glycerol and has a saline taste at low concentration levels. See 21 C.F.R.

§ 184.1622.

e. **Thiamine Mononitrate** ($C12H17N5O4S$, CAS Reg. No. 532-43-4) is the

mononitrate salt of thiamine.  It occurs as white crystals or a white crystalline

powder and is prepared from thiamine hydrochloride by dissolving the

hydrochloride salt in alkaline solution followed by precipitation of the nitrate

half-salt with a stoichiometric amount of nitric acid.  *See* 21 C.F.R. § 184.1878.

Thiamine mononitrate is synthetic, and is chemically distinct from thiamine.  *See*

47 Fed. Reg. 47438; 21 C.F.R. § 184.1878.

f. **Calcium Carbonate/Calcium Chloride** is produced from calcium hydroxide,

calcium chloride, or as a byproduct in the lime soda process.  Federal regulations

recognize calcium hydroxide as a synthetic compound and the FDA has declared that calcium chloride renders a food no longer "natural."[4]  The lime soda process employs hazardous and synthetic substances and requires processing techniques so excessive so as to render the finished product unnatural.  In fact, the EPA has promulgated regulations specifically addressing the environmental impact of calcium carbonate produced through the lime process and by recovery from the solvay waste products.  Additionally, when used in drugs, calcium carbonate is listed as a synthetic compound by federal regulation. 21 C.F.R. § 73.1070.

g.  **Dicalcium Phosphate** is derived from bovines by precipitating the phosphate extracted from a very high grade of bone by the use of high grade chemical lime.[5] It is a recognized synthetic chemical under federal regulations.  *See* 7 C.F.R. § 205.605(b).

h.  **Citric Acid** (2-hydroxy-propane-1, 2,3-tricarboxylic acid) is a synthetic substance. While the chemical's name has the word "citric" in it, citric acid is no longer extracted from the citrus fruit but industrially manufactured by fermenting certain genetically mutant strains of the black mold fungus, *Aspergillus niger*.

i.  **Gelatin** is a synthetic ingredient that is commercially processed using hydrolysis. *See* 9 C.F.R. § 94.20.

j.  **Ascorbic Acid** is a chemical preservative and is synthetic. *See* 21 C.F.R. § 182.3013.

---

[4] *See* FDA Warning Letter to Karl A. Hirzel, Hirzel Canning Co. (Aug. 29, 2001).
[5] https://kb.osu.edu/dspace/bitstream/handle/1811/60894/OARDC_bulletin_n455.pdf?sequence=1

k. **Decyl Glucoside** is a synthetic ingredient obtained by the condensation of decyl alcohol and glucose.[6]

l. **Zinc Oxide** is a synthetic compound. *See, e.g.,* 7 C.F.R. § 205.601(j)(6)(ii). Zinc oxide used in commercial purposes is usually produced by chemical synthesis or by vaporizing metallic zinc at extreme high heat.

m. **Titanium Dioxide** is a color additive that is synthetically prepared Ti02, free from admixture with other substances.[7]

n. **Silica is also known as Silicon Dioxide** and is a synthetic anticaking agent. *See* 21 C.F.R. § 172.480.

o. **Sorbitol** is a type of sugar alcohol used as a synthetic thickener and a skin conditioning agent.[8]

p. **Sodium benzoate** is a synthetic preservative.[9] Sodium benzoate is produced by the neutralization of benzoic acid with sodium hydroxide, or by adding benzoic acid to a hot concentrated solution of sodium carbonate until effervescence ceases. The solution is then evaporated, cooled and allowed to crystalize or evaporate to dryness, and then granulated. It does not occur naturally.[10] Sodium benzoate has been shown to cause DNA damage and chromosomal aberrations.[11] When sodium benzoate combines with ascorbic acid (an ingredient common in

---

[6] http://www.newdirections.com.au/articles/images/Decyl-Glucoside-and-Other-Alkyl-Glucosides-as-Used-in-Cosmetics.pdf
[7] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=73.575
[8] http://www.ewg.org/skindeep/ingredient/706239/SORBITOL/
[9] http://www.ewg.org/skindeep/ingredient/705989/SODIUM_BENZOATE/;
http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm274535.htm.
[10] 21 C.F.R. § 184.1733.
[11] N. Zengin et al., *The Evaluation of the Genotoxicity of Two Food Preservatives: Sodium Benzoate and Potassium Benzoate,* FOOD AND CHEMICAL TOXICOLOGY 763, 764-68 (2011).

many food products) the two substances can react to produce benzene, which is a highly toxic carcinogen.

q. **Potassium Sorbate** is a synthetic preservative.[12] *See* 21 C.F.R. § 582.3640.  It is created by using potassium hydroxide (KOH) to neutralize sorbic acid (C6H8O2). The resulting potassium sorbate may be crystallized from aqueous ethanol. Studies have shown potassium sorbate to have genotoxic effects on humans and other mammals.[13]  It causes chromosomal aberrations in cells, which can trigger the development of cancer.[14]

r. **Sodium Lauryl Sulfate** is an ingredient derived from ethoxylated lauryl alcohol and used as a surfactant (cleansing agent) and as an emulsifier.[15]  It is a synthetic substance.[16]

s. **Glycerin (Vegetable)** is a factory-produced texturizer that is created by complex processing.  It is recognized by federal regulations as synthetic.  *See* 7 C.F.R. § 205.605(b).  It is commonly used as a filler and thickening agent.  It requires multiple processing steps in an industrial environment to create Glycerin. Therefore, it cannot be described as "natural."  A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that Glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a

---

[12] http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm274535.htm.
[13] Sevcan Mamur et al., *Does Potassium Sorbate Induce Genotoxic or Mutagenic Effects in Lymphocytes?*, TOXICOLOGY IN VITRO 790, 793 (2010).
[14] *Id.*
[15] http://www.ewg.org/skindeep/ingredient/706089/SODIUM_LAURETH_SULFATE/#.WbmUeiiGOUk
[16] http://www.hebebotanicals.co.nz/sodium-coco-sulfate-another-synthetic-detergent/

"synthetic nonagricultural (nonorganic) substance." The same report lists several methods of producing Glycerin, each of which involves numerous steps that include the use of high temperatures and pressure and purification to get an end product.

| Table 2 Processes for producing glycerin by hydrolysis of fats and oils[17] | |
|---|---|
| Lemmens Fryer's Process | Oil or fat is subjected in an autoclave to the conjoint action of heat and pressure (about 100 PSI) in the presence of an emulsifying and accelerating agent, e.g. zinc oxide or hydroxide (sodium hydroxide can be substituted) for about eight hours. The strong solution of glycerin formed is withdrawn and replaced by a quantity of hot, clean and preferably distilled water equal to about one third to one fourth of the weight of the original charge of oil or fat and treatment continued for an additional four hours. The diluted glycerin obtained from the latter part of the process is drawn off and used for the initial treatment of the further charge of oil or fat. |
| Budde and Robertson's Process | The oils or fats are heated and mechanically agitated with water and sulphuric acid gas, under pressure in a closed vessel or autoclave. The advantages claimed for the process are that the contents of the vessel are free from foreign matter introduced by reagents and need no purification; that the liberated glycerin is in the form of a pure and concentrated solution; that no permanent emulsion is formed; and that the fatty acids are not discolored. |
| Ittner's Process | Coconut oil is kept in an autoclave in the presence of water at 70 atmospheres of pressure and 225-245°C temperature and split into fatty acids and glycerin, both being soluble under these conditions in water. The glycerin solution separates in the bottom of the autoclave. The aqueous solution contains at the end of the splitting process more than 30 percent glycerin. |
| Continuous High Pressure Hydrolysis | In this process a constant flow of fat is maintained flowing upward through an autoclave column tower against a downward counterflow of water at a pressure of 600 PSI maintained at temperature of 480-495°F. Under these conditions, the fat is almost completely miscible in water and the hydrolysis takes place in a |

---

[17] https://www.ams.usda.gov/sites/default/files/media/Glycerin%20Petition%20to%20remove%20TR%202013.pdf

| | very short time. The liberated fatty acids, washed free of glycerin by the downward percolating water, leave the top of the column and pass through a flash tank while the liberated glycerin dissolves in the downward flow of water and is discharged from the bottom of the tower into the sweet-water storage tank. |
|---|---|

10.     Whether Defendant's labeling of the Products as "Natural" is deceptive is judged by whether it would deceive or mislead a reasonable person. To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

11.     In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural). In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter. **(Exhibit B).**

12.     Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources." 7 U.S.C. § 6502(21).

13.     Surveys and other market research, including expert testimony Plaintiff intends to introduce, will demonstrate that the term "natural," when used to describe goods such as the

Products, is misleading to a reasonable consumer because the reasonable consumer believes that

the term "natural" means that the goods are free of synthetic ingredients.

14.    Consumers lack the meaningful ability to test or independently ascertain or verify

whether a product is natural, especially at the point of sale.  Consumers would not know the true

nature of the ingredients merely by reading the ingredients label.

15.    Discovering that the ingredients are not natural and are actually synthetic requires

a scientific investigation and knowledge of chemistry beyond that of the average consumer.  That

is why, even though the ingredients listed above are identified on the back of the Products'

packaging in the ingredients listed, the reasonable consumer would not understand – and is not,

and should not be, expected to understand – that these ingredients are synthetic.

16.    Moreover, the reasonable consumer is not expected or required to scour the

ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent

front-of-the-Product claims, representations, and warranties that the Products are "Natural."

17.    Defendant did not disclose that the above-listed ingredients are synthetic

ingredients.  A reasonable consumer understands Defendant's "Natural" claims to mean that the

Products do not contain synthetic ingredients.

I.    **Defendant's Representations and Omissions Have Caused Injury to Class Members**

18.    Consumers rely on label representations and information in making purchasing

decisions.

19.    The marketing of the Products as "Natural" in a prominent location on the labels

of all of the Products throughout the Class Period evidences Defendant's awareness that

14

"Natural" claims are material to consumers.

20.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

21.     Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

22.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

23.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled "Natural" over comparable products not so labeled.

24.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class Members in that they:

   a. Paid a sum of money for Products that were not what Defendant represented;

   b. Paid a premium price for Products that were not what Defendant represented;

   c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

   d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

15

25.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products or pay a premium.

26.     Plaintiff and the Class Members paid for Products that were "Natural," but received Products that were not "Natural." The Products Plaintiff and the Class Members received were worth less than the Products for which they paid.

27.     Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products.

28.     Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

29.     Consequently, Plaintiff and Class Members were damaged in the amount of the price they overpaid for the Products, in an amount to be proven at trial.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because: (1) this is a class action involving more than 100 Class Members; (2) there is minimal diversity; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

31.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of New York, contracts to supply goods within the State of New York, and supplies goods within the State of New York.

32.     Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the State of New York. A substantial part of the events or omissions giving rise to Plaintiff and the Class members' claims occurred in this District.

**PARTIES**

**Plaintiff**

33.     Plaintiff is an individual consumer who, at all times material hereto, was a citizen of the State of New York and resided in this District.  In the summer of 2019, Plaintiff purchased the Nylabone Natural Nubz Edible Chews (Chicken Flavor) and the Nylabone Advanced Oral Care Natural Toothpaste from Chewy.com.  The packaging of the Products Plaintiff purchased contained the representations that they were "Natural," and Plaintiff relied on such representations in purchasing the Products.

34.     Plaintiff believes that products which are labeled "Natural" do not contain synthetic ingredients.  Plaintiff believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.  If the Products were actually "Natural," as represented on the Products' labels, Plaintiff would purchase the Products in the immediate future.

35.     Had Defendant not made the false, misleading, and deceptive representation that the Products were "Natural," Plaintiff would not have been willing to purchase, or alternatively,

pay the same amount for the Products, and, consequently, he would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for the Products than he would have had he known the truth about the Products. Since the Products Plaintiff received were worth less than the Products for which he paid, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

36.     Defendant Nylabone Corp. is a corporation with its principal place of business in Neptune City, New Jersey.  Defendant manufactures, markets, advertises and distributes the Products in New York and throughout the United States.  Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

## CLASS ALLEGATIONS

37.     Plaintiff brings this matter on behalf of himself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this action is uniquely situated for class-wide resolution, including injunctive relief.

38.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings this action on behalf of himself and the proposed Class:

> All persons who purchased in the United States any of the Products, within the applicable statute of limitations until the date notice is disseminated.

39.     Excluded from the Class are: (i) Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendant's

18

employees, officers, directors, agents, and representatives and their family members; (iv) all persons who make a timely election to be excluded from the Class; and (v) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family.

40.      Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff also seeks certification of the following Subclass ("New York Subclass"):

> All persons who purchased in New York any of the Products, within the applicable statute of limitations until the date notice is disseminated.

41.      The Class and New York Subclass shall be referred to collectively throughout the Complaint as the "Class" or "Classes."

42.      The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy as set forth below:

43.      Numerosity: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

44.      Commonality: The questions of law and fact common to the Class Members include, but are not limited to:

> a.   Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;
>
> b.   Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

c. Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the "natural" quality of its Products;

d. Whether Defendant failed to comply with its warranties;

e. Whether Nylabone Products are "natural" as that term is understood by reasonable consumers;

f. Whether Plaintiff and the Class are entitled to injunctive relief;

g. Whether Defendant was unjustly enriched;

h. Whether Plaintiff and the Class are entitled to money damages.

45.     Typicality: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Defendant's Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

46.     Adequacy: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent; his consumer fraud claims are common to all members of the Class, and he has a strong interest in vindicating his rights; and he has retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.

47.     Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices and whether the Products are sold as advertised.

48.　　<u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

    a.　The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    b.　The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

    c.　When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

    d.　This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

    e.　Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

    f.　This class action will assure uniformity of decisions among Class Members;

    g.　The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

    h.　Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class

21

action; and

i.   It would be desirable to concentrate in this single venue the litigation of all

consumers who were induced by Defendant's uniform false advertising to

purchase its Products as being "Natural."

49.   Accordingly, this Class is properly brought and should be maintained as a class

action under Rule 23(b)(3) because questions of law or fact common to Class Members

predominate over any questions affecting only individual members, and because a class action is

superior to other available methods for fairly and efficiently adjudicating this controversy.

## INJUNCTIVE CLASS RELIEF

50.   Rule 23(b)(2) contemplates a class action for purposes of seeking class-wide

injunctive relief.  Here, Defendant has engaged in conduct resulting in misleading consumers

about its Products.  Since Defendant's conduct has been uniformly directed at all consumers in

the United States, and the conduct continues presently, injunctive relief on a class-wide basis is a

viable and suitable solution to remedy Defendant's continuing misconduct. Plaintiff would

purchase the Products again if the ingredients and/or design were changed so that they indeed

were "Natural."

51.   The injunctive Class is properly brought and should be maintained as a class

action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality,

typicality, and adequacy because:

a.   Numerosity: Individual joinder of the injunctive Class Members would be wholly

impracticable.  Defendant's Products have been purchased by thousands of people

throughout the United States;

22

b. <u>Commonality</u>: Questions of law and fact are common to members of the Class. Defendant's misconduct was uniformly directed at all consumers.  Thus, all members of the Class have a common cause against Defendant to stop their misleading conduct through an injunction.  Since the issues presented by this injunctive Class deal exclusively with Defendant's misconduct, resolution of these questions would necessarily be common to the entire Class.  Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

    i.  Whether members of the Class will continue to suffer harm by virtue of Defendant's deceptive product marketing and labeling;

    ii.  Whether, on equitable grounds, Defendant should be prevented from continuing to deceptively mislabel their Products as being "Natural"; and

    iii.  Whether Defendant should be enjoined from selling the Products.

c. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the injunctive Class because his claims arise from the same course of conduct (i.e. Defendant's deceptive and misleading marketing, labeling, and advertising practices).  Plaintiff is a typical representative of the Class because, like all members of the injunctive Class, he purchased Defendant's Products which were sold unfairly and deceptively to consumers throughout the United States.

d. <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the injunctive Class.  His consumer protection claims are common to all

members of the injunctive Class and he has a strong interest in vindicating his rights. In addition, Plaintiff and the Class are represented by counsel who is competent and experienced in both consumer protection and class action litigation.

52.     The injunctive Class is properly brought and should be maintained as a class action under Rule 23(b)(2) because Plaintiff seeks injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class. Certification under Rule 23(b)(2) is appropriate because Defendant has acted or refused to act in a manner that applies generally to the injunctive Class (i.e. Defendant has marketed its Products using the same misleading and deceptive labeling to all of the Class Members). Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendant would be prevented from continuing its misleading and deceptive marketing practices and would be required to honestly disclose to consumers the nature of the contents of its Products. Plaintiff would purchase the Products again if the ingredients were changed so that they indeed were "Natural"

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and New York Subclass Members)**

53.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

54.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

55.     The conduct of Defendant alleged herein constitutes recurring, "unlawful"

24

deceptive acts and practices in violation of GBL § 34, and, as such, Plaintiff and the New York

Subclass Members seek monetary damages and the entry of preliminary and permanent

injunctive relief against Defendant, enjoining them from inaccurately describing, labeling,

marketing, and promoting the Products.

56.     There is no adequate remedy at law.

57.     Defendant misleadingly, inaccurately, and deceptively advertises and markets its

Products to consumers.

58.     Defendant's improper consumer-oriented conduct—labeling and advertising the

Products as being "Natural,"—is misleading in a material way in that it, inter alia, induced

Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's

Products and to use the Products when they otherwise would not have. Defendant made its

untrue and/or misleading statements, misrepresentations, and omissions willfully, wantonly, and

with reckless disregard for the truth.

59.     Plaintiff and the New York Subclass Members have been injured inasmuch as

they paid a premium for products that were—contrary to Defendant's representations— not

"Natural." Accordingly, Plaintiff and the New York Subclass Members received less than what

they bargained and/or paid for.

60.     The Products' packaging and labeling, and Defendant's omissions regarding the

nature of the Products, induced Plaintiff and the New York Subclass Members to buy

Defendant's Products and to pay a premium price for them.

61.     Defendant's deceptive and misleading practices constitute a deceptive act and

practice in the conduct of business in violation of New York General Business Law §349(a) and

Plaintiff and the New York Subclass Members have been damaged thereby.

62.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

63.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

64.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows: False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

65.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

66.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products are "Natural."

67.     Plaintiff and the New York Subclass Members have been injured inasmuch as

they relied upon the labeling, packaging, advertising, misrepresentations and omissions and paid a premium for the Products which were—contrary to Defendant's representations—not "Natural." Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

68.    Defendant's advertising, packaging, labeling, misrepresentations and omissions induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

69.    Defendant made its untrue and/or misleading statements, misrepresentations, and omissions willfully, wantonly, and with reckless disregard for the truth.

70.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

71.    Defendant made the material misrepresentations described in this Complaint in its advertising, and on the Products' packaging and labeling.

72.    Defendant's material misrepresentations and omissions were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations and omissions.

73.    As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (On Behalf of Plaintiff and All Class Members or in the Alternative, the New York Subclass Members)

74.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

75.    Defendant provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are "Natural."

76.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

77.    These affirmations of fact became part of the basis for the bargain and were material to the Plaintiff's and Class Members' transactions.

78.    Plaintiff and Class Members reasonably relied upon the Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

79.    On or about August 5, 2019, Defendant was sent a letter and draft complaint, which placed Defendant on notice of its breach, giving Defendant an opportunity to cure its breach. Defendant did not respond to said letter and has not cured its breach.

80.    Defendant breached the express warranty because the Products are not "Natural" because they contain synthetic ingredients.

81.    Defendant thereby breached the following state warranty laws:

      a.     Code of Ala. § 7-2-313;

b.   Alaska Stat. § 45.02.313;

c.   A.R.S. § 47-2313;

d.   A.C.A. § 4-2-313;

e.   Cal. Comm. Code § 2313;

f.   Colo. Rev. Stat. § 4-2-313;

g.   Conn. Gen. Stat. § 42a-2-313;

h.   6 Del. C. § 2-313;

i.   D.C. Code § 28:2-313;

j.   Fla. Stat. § 672.313;

k.   O.C.G.A. § 11-2-313;

l.   H.R.S. § 490:2-313;

m.   Idaho Code § 28-2-313;

n.   810 I.L.C.S. 5/2-313;

o.   Ind. Code § 26-1-2-313;

p.   Iowa Code § 554.2313;

q.   K.S.A. § 84-2-313;

r.   K.R.S. § 355.2-313;

s.   11 M.R.S. § 2-313;

t.   Md. Commercial Law Code Ann. § 2-313;

u.   106 Mass. Gen. Laws Ann. § 2-313;

v.   M.C.L.S. § 440.2313;

w.   Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313;

xx.    Wyo. Stat. § 34.1-2-313.

82.    As a direct and proximate result of Defendant's breach of express warranty, Plaintiff and Class Members were damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE MAGNUSON-MOSS
### WARRANTY ACT, 15 U.S.C. § 2301 *et seq.*
### (On Behalf of Plaintiff and All Class Members)

83.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

84.    The Magnuson-Moss Warranty Act provides a federal remedy for consumers who have been damaged by the failure of a supplier or warrantor to comply with any obligation under a written warranty or implied warranty, or other various obligations established under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*.

85.    The Products are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

86.    Plaintiff and other members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

87.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4) & 2301(5).

88.     Defendant represented in writing that the Products are "Natural."

89.     These statements were made in connection with the sale of the Products and relate to the nature of the Products and affirm and promise that the Products are as represented and defect free and, as such, are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

90.     As alleged herein, Defendant breached the written warranty by selling consumers Products that are not "Natural."

91.     The Products do not conform to Defendant's written warranty and therefore violate the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.  Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY
**(On Behalf of Plaintiff and All Class Members or, in the Alternative, the New York Subclass Members)**

92.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

93.     Defendant is in the business of manufacturing, distributing, marketing and advertising the above listed products.

94.     At all times relevant hereto, Defendant was under a duty imposed by law requiring that manufacturers' and merchants' products be reasonably fit for the ordinary purposes for which the product is used, and that the product be acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain

32

between Nylabone on the one hand, and Plaintiff and Class Members, on the other.

95.     Under the Uniform Commercial Code's implied warranty of merchantability, Defendant warranted to Plaintiff and Class Members that the Products are "Natural."

96.     Defendant breached the implied warranty of merchantability in that Defendant's Products' ingredients deviate from the label and products' description, and reasonable consumers expecting a product that conforms to its label would not accept Defendant's Products if they knew that they actually contained synthetic ingredients that are not "Natural."

97.     Defendant also breached the implied warranty of merchantability in that Nylabone Products were defective and posed a serious safety risk to the dogs of Plaintiff and Class Members at the time of sale.  As such, the Products would not pass without objection, are not fit for the ordinary purposes for which such goods are used and failed to conform to the standard performance of like products used in the trade.

98.     Within a reasonable amount of time after the Plaintiff discovered that the Products contain synthetic ingredients, Plaintiff notified Defendant of such breach.

99.     The inability of Defendant's Products to meet the label description was wholly due to Defendant's fault and without Plaintiff's or Class Members' fault or neglect and was solely due to Defendant's manufacture and distribution of the Products to the public.

100.    As a result of the foregoing, Plaintiff and Class Members have been damaged in an amount to be proven at trial, together with interest thereon from the date of purchase.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
**(On Behalf of Plaintiff and All Class Members or, in the Alternative, the New York Subclass Members)**

33

101.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

102.    As a direct and proximate result of the misconduct set forth above, Defendant has been unjustly enriched.

103.    Through deliberate misrepresentations or omissions made in connection with the advertising, marketing, promotion, and sale of Nylabone Products during the Class Period, Defendant reaped benefits, which resulted in its wrongful receipt of profits. Accordingly, Defendant will be unjustly enriched unless ordered to disgorge those profits for the benefit of Plaintiff and the Class. This claim is pleaded in the alternative to Plaintiff's contract-based claims.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court:

A.    Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiff and the Class in an amount to be determined at trial;

C.    Grant restitution to Plaintiff and the Class and require Defendant to disgorge its ill-gotten gains;

D.    Declare that Defendant violated the consumer protection laws alleged in this Complaint, and permanently enjoin Defendant from engaging in the wrongful and unlawful conduct alleged herein;

E.    Award punitive damages, to the extent permitted by law, in an amount to be determined at trial;

34

F.     Award Plaintiff, the Class and the New York Subclass their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.     Award Plaintiff, the Class and the New York Subclass pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.     Award all such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 15, 2020

**THE SULTZER LAW GROUP P.C.**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
sultzerj@thesultzerlawgroup.com
Janine Pollack, Esq.
pollackj@thesultzerlawgroup.com
Jeremy Francis, Esq.
francisj@thesultzerlawgroup.com
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747

**PEARSON, SIMON & WARSHAW, LLP**
Melissa S. Weiner
mweiner@pswlaw.com
Joseph C. Bourne
jbourne@pswlaw.com
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*Counsel for Plaintiff and the Class*

35